No. 24-11299

# In the
# United States Court of Appeals
## for the Eleventh Circuit

Robert (Robbin) Bayse,

*Plaintiff-Appellee,*

v.

Ted Philbin, *et al.,*

*Defendant-Appellants.*

On Appeal from the United States District Court for the
Southern District of Georgia.
No. 1:22-CV-24 — J. Randal Hall, *Chief Judge*

## BRIEF OF DEFENDANT-APPELLANTS

Loretta L. Pinkston-Pope
 *Deputy Attorney General*
Roger A. Chalmers
 *Sr. Asst. Attorney General*
Jason H. Kang
 *Assistant Attorney General*

Christopher M. Carr
 *Attorney General of Georgia*
Stephen J. Petrany
 *Solicitor General*
James E. Barrett
 *Deputy Solicitor General*

Office of the Georgia
 Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellants*

*Bayse v. Philbin*, No. 24-11299

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Barrett, James, *Counsel for Defendant-Appellants*

Bayse, Robert (Robbin), *Plaintiff-Appellee*

Bendin, Sumrall & Ladner, LLC, *Counsel for Defendants*

Carr, Christopher M., *Counsel for Defendant-Appellants*

Chalmers, Roger A., *Counsel for Defendant-Appellants*

Chaput, Isaac, *Counsel for Plaintiff-Appellee*

Clements, Paul, *Defendant*

Dangaran, D, *Counsel for Plaintiff-Appellee*

Davis, Minnie, *Defendant*

Epps, Hon. Brian K., *United States Magistrate Judge*

Gaines, Ramondo, *Defendant*

Gianchetti, Robert, *Counsel for Plaintiff-Appellee*

Grossman, Rachel, *Counsel for Plaintiff-Appellee*

Hall, Hon. J. Randal, *United States District Judge*

Harvey, Tamika, *Defendant-Appellant*

Hughes, Joscelyn M., *Counsel for Defendants*

Jackson, Javel, *Defendant*

*Bayse v. Philbin*, No. 24-11299

Jones, Tyler, *Counsel for Defendants*

Kang, Jason H., *Counsel for Defendant-Appellants*

Lewis, Sharon, *Defendant*

Moss, Carrie A., *Counsel for Defendants*

Petrany, Stephen, *Counsel for Defendant-Appellants*

Philbin, Ted, *Defendant-Appellant*

Pinkston-Pope, Loretta, *Counsel for Defendant-Appellants*

Ross, CERT Officer, *Defendant*

Sandley, Caitlin, *Counsel for Plaintiff-Appellee*

Shelton, Ruthie, *Defendant-Appellant*

Smith, Jason, *Defendant*

Taylor, Melanie, *Counsel for Defendants*

Ward, Timothy, *Defendant*

Young, Donna, *Defendant*

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellants request oral argument in this appeal. This case involves a deliberate-indifference claim by a Georgia inmate with gender dysphoria, who demanded (and was refused) access to feminine cosmetic items. The district court, though holding that the plaintiff failed to produce *any evidence* of medical necessity, denied the prison warden defendants summary judgment on the basis that they had failed to *disprove* medical necessity. That decision erroneously flips the burden of proof in deliberate-indifference cases. Given the serious implications for prison administration, the decisional process would be aided by oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ........................................................ iv

Jurisdiction ................................................................ vii

Statement of Issues ......................................................... 1

Introduction ................................................................ 2

Statement of the Case........................................................ 5

    A.  Factual Background ................................................ 6

    B.  Proceedings Below.............................................. 14

    C.  Standard of Review ............................................. 18

Summary of Argument ..................................................... 18

Argument .................................................................. 22

    I.  The district court erroneously held that the prison wardens could be liable for deliberate indifference even though Bayse established none of the necessary elements............ 22

        A.  Bayse produced no evidence of an objective, serious risk of substantial harm. ..................................... 24

        B.  Bayse produced no evidence of subjective criminal recklessness. ................................................ 32

        C.  Bayse produced no evidence that the prison wardens' denial of his request was unreasonable....................... 34

        D.  Bayse produced no evidence that the prison wardens caused him *any* harm. .................................... 40

## TABLE OF CONTENTS
### (continued)

**Page**

II. At minimum, the prison wardens are entitled to qualified immunity because there is no clearly established law that would provide for liability.................................................. 43

Conclusion......................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Poag,*
    61 F.3d 1537 (11th Cir. 1995) .................................................... 30

*Campbell v. Kallas,*
    936 F.3d 536 (7th Cir. 2019) ................................................. 3, 35

*Diamond v. Owens,*
    131 F. Supp. 3d 1346 (M.D. Ga. 2015)...................................... 45

*Doty v. Cnty. of Lassen,*
    37 F.3d 540 (9th Cir. 1994) ....................................................... 31

*Eknes-Tucker v. Governor of Alabama,*
    80 F.4th 1205 (11th Cir. 2023).................................................. 29

*Ellis v. United States,*
    673 F.3d 367 (5th Cir. 2012) ..................................................... 42

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ..................................................................... 23

*\*Farmer v. Brennan,*
    511 U.S. 825 (1994) .................................. 4, 19–21, 23, 24, 31, 35

*Farrow v. West,*
    320 F.3d 1235 (11th Cir. 2003) ................................................. 25

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) ........................27, 28, 30, 31, 36, 40

*Gilmore v. Hodges,*
    738 F.3d 266 (11th Cir. 2013) ................................................... 45

*Goebert v. Lee Cnty.,*
    510 F.3d 1312 (11th Cir. 2007) ................................................. 25

iv

*Great Lakes Ins. SE v. Wave Cruiser LLC*,
  36 F.4th 1346 (11th Cir. 2022) .................................................... 4

*Grider v. City of Auburn*,
  618 F.3d 1240 (11th Cir. 2010) ................................................. 22

*Hale v. Tallapoosa Cnty.*,
  50 F.3d 1579 (11th Cir. 1995) ................................................... 40

*Hill v. Dekalb Reg'l Youth Det. Ctr.*,
  40 F.3d 1176 (11th Cir. 1994) .............................................25, 41

*Hinson v. Edmond*,
  205 F.3d 1264 (11th Cir. 2000) ................................................. 18

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
  973 F.3d 1263 (11th Cir. 2020) ............. 20, 25, 26, 28, 30, 35, 37

*Johnson v. City of Miami Beach*,
  18 F.4th 1267 (11th Cir. 2021)................................................. 44

*Keohane v. Fla. Dep't of Corr. Sec'y*,
  952 F.3d 1257 (11th Cir. 2020).. ..... 2, 4, 6, 19, 20, 23–26, 28, 30,
  35–37, 39, 43, 46, 47

*King v. Pridmore*,
  961 F.3d 1135 (11th Cir. 2020) .............................................44, 46

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014) (en banc)...........25, 28, 30, 32, 34, 38

*Kothmann v. Rosario*,
  558 F. App'x 907 (11th Cir. 2014) ........................................45, 46

*Lee v. Ferraro*,
  284 F.3d 1188 (11th Cir. 2002) ................................................. 44

*Mann v. Taser Int'l, Inc.*,
  588 F.3d 1291 (11th Cir. 2009) ................................................. 43

*Marbury v. Warden,*
    936 F.3d 1227 (11th Cir. 2019) ................................................. 26

*Nelson v. Tompkins,*
    89 F.4th 1289 (11th Cir. 2024)................................................. 18

*Redmond v. Kosinski,*
    999 F.3d 1116 (8th Cir. 2021) ................................................. 41

*Supre v. Ricketts,*
    792 F.2d 958 (10th Cir. 1986) ................................................. 37

*Taylor v. Adams,*
    221 F.3d 1254 (11th Cir. 2000) ..........................................24, 32

*West v. Tillman,*
    496 F.3d 1321 (11th Cir. 2007) ................................................. 23

*Whitley v. Albers,*
    475 U.S. 312 (1986) ................................................................. 39

*Wingster v. Head,*
    318 F. App'x 809 (11th Cir. 2009) ............................................ 41

## Other Authorities

Emily Yoffe, *A Doctor Told the Truth. The Feds Showed
    Up at His Door.*, The Free Press (June 10, 2024)
    https://www.thefp.com/p/eithan-haim-gender-
    distressed-children-indicted....................................................... 29

*Leaked discussions reveal uncertainty about
    transgender care*, The Economist (March 5, 2024)
    https://www.economist.com/united-
    states/2024/03/05/leaked-discussions-reveal-
    uncertainty-about-transgender-care......................................... 29

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellee Bayse sued the Defendant-Appellant prison wardens under 42 U.S.C. § 1983.

This Court has appellate jurisdiction over the district court's order denying Defendant-Appellants' motion for summary judgment based on qualified immunity under the collateral-order doctrine and 28 U.S.C. § 1291, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), because the case involves several "abstract issue[s] of law related to qualified immunity": whether the district court (1) failed to apply the correct standard for summary judgment, (2) failed to analyze the relevant elements of a deliberate-indifference claim, and (3) wrongly denied qualified immunity without the support of any clearly established law. *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024).

This appeal is timely because the district court's order was entered on March 26, 2024, Doc. 130, and Defendant-Appellants filed a notice of appeal on April 15, 2024, Doc. 131.

## STATEMENT OF ISSUES

1.     Do prisoners diagnosed with gender dysphoria have a constitutional right to grow long hair and wear makeup, earrings, and nail polish?

2.     Did the district court err when, despite holding that the plaintiff failed to produce "any evidence" that cosmetic items are medically necessary, it denied summary judgment because the defendants had not produced undisputed evidence *affirmatively disproving* that cosmetic items are medically necessary?

3.     Did the district court wrongly deny qualified immunity, given that this Court held in *Keohane v. Florida Department of Corrections Secretary*, 52 F.3d 1257, 1272 (11th Cir. 2020), that refusing to permit an inmate diagnosed with gender dysphoria to wear long "hair, use makeup, and wear female undergarments" does not violate the Eighth Amendment?

## INTRODUCTION

The Eighth Amendment's prohibition on cruel and unusual punishment does not require prison officials to allow inmates—including inmates with gender dysphoria—to grow long hair and wear earrings, makeup, and nail polish. Indeed, this Court has specifically held that prisoners do not have a constitutional right to cosmetic items, even if they would be "psychologically pleasing." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1264 (11th Cir. 2020). Yet here, the district court denied prison officials qualified immunity on that very issue.

The district court did so via multiple errors of law, none more egregious than its shifting of the burden of proof onto the defendants. Despite holding that the plaintiff "failed to submit any evidence of medical necessity," Doc. 123 at 14, the district court denied summary judgment because (supposedly) the prison officials had not *disproven* medical necessity, *id*. at 15, 23. But defendants in a deliberate-indifference action have no burden of proof at all, and this Court should reverse.

Stepping back slightly, this is the third time that Plaintiff-Appellee Robert (Robbin) Bayse has sued Georgia prison officials because he is not satisfied with the treatments they provide to inmates with gender dysphoria. The first time, Bayse demanded

sex-reassignment surgery.  The second time, it was sex-reassignment surgery and exemptions from the prison's grooming and personal effects policies—to be specific, Bayse wanted to grow long hair and wear earrings, makeup, and nail polish.  In Bayse's view, weekly mental health counseling, cross-sex hormones, and regular visits with an endocrinologist are not enough.  But Bayse lost both times, because the Eighth Amendment's protection against cruel and unusual punishment does not grant prisoners a right to their personally preferred medical treatment, and it certainly does not grant them a right to demand "cosmetic accommodations."  *Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019).  If makeup and long hair are not medically necessary for women to be women—and they are not—then they are not medically necessary for men that identify as women either.

The result should have been the same the third time around, but the district court ignored the actual standard for deliberate-indifference claims, flipped the burden of proof, and denied summary judgment just because the *defendants* supposedly did not produce enough evidence to *disprove* Bayse's deliberate-indifference claim.  That is exactly backwards.  A plaintiff must produce evidence to support each element of his claim.  And when the plaintiff fails to do so, the defendants are entitled to summary

judgment. *Great Lakes Ins. SE v. Wave Cruiser LLC*, 36 F.4th 1346, 1356 (11th Cir. 2022). The first requirement for a deliberate-indifference claim is that there be an objective risk of serious injury in the absence of the desired "treatment." *Keohane*, 952 F.3d at 1266. Here, the district court held that Bayse failed to provide *any* evidence that cosmetic items were medically necessary, and that should have been the end of it.

On top of that (dispositive) failure, the district court didn't even analyze the other elements of a deliberate-indifference claim. If it had, it would have realized that Bayse's claim fails at every step. Bayse produced no evidence of subjective criminal recklessness, i.e., that the prison wardens *knew* Bayse was at a serious risk of harm in the absence of cosmetic items and yet declined to do anything about it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Nor did Bayse prove that the prison wardens' actions were unreasonable. *Id.* at 844. Even if Bayse had introduced evidence on this point, prison officials are not deliberately indifferent if they pick one side over the other in a contested medical debate.

Lastly, the district court wrongly denied qualified immunity without any supporting clearly established law. Not only did Bayse fail to produce a single case holding that denying cosmetic

or grooming requests amounts to deliberate indifference, the on-point precedent—*Keohane*—holds the exact opposite.  The district court's attempt to distinguish *Keohane* fails on its own terms.  In the district court's view, "the outcome in *Keohane* was based on the plaintiff's failure to establish medical necessity."  Doc. 123 at 22.  Yet the district court also held (correctly) that Bayse "failed to submit any evidence of medical necessity."  *Id.* at 14.  The district court's decision is internally contradictory and wrong.  This Court should reverse.

## STATEMENT OF THE CASE

Plaintiff-Appellant Robert (Robbin) Bayse, a Georgia inmate diagnosed with borderline personality disorder and gender dysphoria, sued a collection of prison officials under § 1983, claiming cruel and unusual punishment because they refused to permit Bayse to grow long hair and wear "makeup, earrings, [and] nail polish."  Doc. 1 at 6; see also Doc. 102-3 at 33.  The district court at summary judgment denied the prison wardens qualified immunity, concluding that it was their burden "to establish an adequate and convincing record of undisputed facts" to defeat Bayse's claim, and that they failed to do so.  Doc. 123 at 15; *see also* Doc. 130.  The prison wardens appeal that denial of qualified immunity.

5

## A.  Factual Background

**1.** Bayse was convicted of rape, aggravated sodomy, and child molestation and sentenced to life in prison in 1998.  Doc. 102-3 at 12.  At that time, prison medical providers diagnosed Bayse with borderline personality disorder, schizoaffective disorder, and major depressive disorder (Bayse was "[h]earing voices" and having "hallucinations"), so they prescribed an antipsychotic medication (Risperdal).  Doc. 102-3 at 15, 79; *see also* Bayse Deposition, *Bayse v. Dozier*, No. 5:18-cv-49 (Jan. 25, 2019), Doc. 48-3 at 20, 70–71, 76–77.  From the start of his incarceration, Bayse repeatedly threatened suicide and self-harm, attempted suicide, and engaged in acts of self-harm.  Doc. 102-3 at 52–53; *see* Doc. 95 at 6; Doc. 94-3 at 5–6 (Bayse's "symptoms are indicative of Borderline Personality Disorder").

Around two decades later, in 2015, prison medical providers also diagnosed Bayse with "gender dysphoria," Doc. 102-3 at 16, which occurs when a person develops a "gender identity" inconsistent with his biological sex, *Keohane*, 952 F.3d at 1262. Some individuals with gender dysphoria seek cross-sex hormones or surgical intervention to remove the physical features and reproductive capacity unique to the person's biological sex.  *Id.* Bayse requested and prison officials provided cross-sex hormones,

including a daily testosterone suppressant (Spironolactone) and an every-other-week estrogen supplement (Depo-Estradiol), and endocrinologists monitored Bayse's health at regular appointments every 3 to 6 months.  Doc. 102-1 at 2.

Prison officials also consistently provided Bayse with mental health treatment, including regular one-on-one mental health counseling that addressed both Bayse's borderline personality disorder and gender dysphoria.  Doc. 94-1 at 5; Doc. 95 at 6–7. Bayse's mental health providers would develop treatment plans outlining Bayse's conditions, his goals, treatments, and the intervention strategies they recommended Bayse practice.  Doc. 94-1 at 4; *see* Doc. 94-1 at 11–12.  Providers generally updated mental health treatment plans every 12 months and anytime a prisoner was transferred to a new facility.  Doc. 55-2 at 75; Doc. 94-1 at 4.  Bayse, however, "consistently refused to consider or acknowledge the diagnosis of Borderline Personality Disorder." Doc. 94-1 at 5.  And sometimes that meant that Bayse would refuse his antipsychotic medication.  Doc. 102-13 at 6; Doc. 102-14 at 71–75.

By 2016, Bayse was no longer satisfied with cross-sex hormones, demanded sex-reassignment surgery, and sued prison officials when they refused.  Doc. 102-14 at 77; Complaint, *Bayse*

7

*v. Holt*, No. 1:17-cv-962 (Mar. 15, 2017), Doc. 1 at 4; *see also Bayse v. Holt*, Doc. 8 at 6.  Bayse also claims to have "attempted castration" four times before filing that suit.  Doc. 102-3 at 166; Doc. 102-15 at 55.  In May 2017, a magistrate judge recommended denying Bayse's request for sex-reassignment surgery, *Bayse v. Holt*, Doc. 6 at 12, and in response Bayse threatened to "cut [his] balls off," so prison officials placed him in suicide precautions.  Doc. 102-15 at 77–84.

A few months later, Bayse sued a second time, again demanding sex-reassignment surgery and also demanding that prison officials provide opposite-sex "clothing, grooming, or commissary items."  *Bayse v. Dozier*, No. 5:18-cv-49, Doc. 1 at 7, 14; Doc. 65 at 24.  While that suit was pending, Bayse continued to engage in threats and acts of self-harm while demanding sex-reassignment surgery, special permission to wear makeup, and special permission to grow long hair.  Doc. 89 at 88 (Bayse "cut his face because [official] wouldn't let him wear makeup"); Doc. 102-14 at 80, 84–85, 88 (threatening to "cut [his] nuts out" because of a haircut and reporting that "he hears voices and sees things all the time").  Once, after a haircut, Bayse "cut [his] genitals in anger" and threatened to "kill [him]self."  Doc. 102-12 at 138–39.  Bayse also "refused to speak to [the] crisis team" and "refused medical

attention," Doc. 102-12 at 141, and in response prison officials again placed Bayse in suicide precautions.  Doc. 102-12 at 140.

In May 2019, Bayse was transferred to Georgia State Prison, Doc. 102-1 at 1, and became frustrated when a medical provider determined that an endocrinology consultation was necessary before Bayse could continue some of his hormone medication.  Doc. 102-13 at 140, 142; Doc. 102-14 at 135.  While the consult was pending, Bayse attempted suicide; officials moved him to the crisis stabilization unit.  Doc. 102-14 at 123–150; Doc. 102-15 at 1–8. After the endocrinology visit, medical providers restarted Bayse on cross-sex hormones, though with the warning that continuing hormones increased Bayse's risk of other serious health complications.  Doc. 102-13 at 141.  Bayse's response was that he did "not care if he has a heart attack or [pulmonary embolism], stroke, [or deep vein thrombosis] from [the cross-sex hormone] meds."  Doc. 102-13 at 141.

Around two months before Bayse restarted the cross-sex hormones, the district court dismissed Bayse's second suit demanding sex-reassignment surgery, holding that Bayse's demands amounted to nothing but "a personal disagreement with the opinions of [the prison] medical providers"—not deliberate indifference.  *Bayse v. Dozier*, No. 5:18-cv-49, Doc. 70 at 7–8.  The

9

court also concluded that prison officials were not deliberately indifferent when they denied Bayse opposite-sex "clothing, grooming, or commissary items" because Bayse produced no evidence that these cosmetic items were "medically necessary." Doc. 65 at 24–25.

A few months later, in December 2019, Bayse's mental health services team implemented a new "comprehensive treatment plan" to address his diagnoses of "borderline personality disorder" and "gender dysphoria."  Doc. 102-3 at 118–19.  One of the several intervention strategies the team recommended was that Bayse wear "female undergarments," "make up, earrings, [and] nail polish," and grow long hair.  Doc. 102-3 at 119.  They also recommended continuing cross-sex hormones, using female pronouns, continuing to seek sex-reassignment surgery, and attending twice-a-month mental health therapy sessions.  *Id.*  And the mental health team agreed to use "gender affirming language" and "advocate" for Bayse "through education and training" of other employees and "consistent efforts to expand institutional practices that affirm the client's female identity."  *Id.*  Two weeks after the mental health providers and Bayse agreed to the new treatment plan, Bayse was transferred from Georgia State Prison to Augusta State Medical Prison.  Doc. 95 at 2.

**2.** Soon after arriving at Augusta State Medical Prison, Bayse underwent a mental health evaluation; Psychologist Dr. Rasheed provided a new, individualized treatment plan. Doc. 94-1 at 4–5. As part of the plan of care, Bayse received consistent one-on-one mental health counseling for both borderline personality disorder and gender dysphoria, though Bayse "consistently refused to [even] acknowledge the diagnosis of Borderline Personality Disorder." Doc. 94-1 at 5. The new treatment plan included neither wearing female undergarments nor female grooming and cosmetic standards. Doc. 94-1 at 11–12. To the contrary, both Dr. Clements, Bayse's treating psychologist, and Minnie Davis, Bayse's licensed counselor, concluded that, in their "professional opinion[s]" "female grooming and cosmetic accommodations would not be appropriate or clinically indicated for Inmate Bayse" or "address [Bayse's] diagnosis of Borderline Personality Disorder." Doc. 94-1 at 4; Doc. 94-3 at 3. The prison wardens had no role in the development of Bayse's treatment plan.

Bayse disagreed with this updated treatment plan and began escalating conflict with staff, both prison officials generally and the mental health treatment team specifically. In the first few months after Bayse arrived at Augusta State Medical Prison, various officials—including Deputy Warden Harvey—told Bayse

that makeup, earrings, nail polish, and long hair violated prison policy. Doc. 102-3 at 29–33; Doc. 55-2 at 197–99. Bayse complained to Warden Philbin in April or May 2020, demanding that Philbin intervene and exempt Bayse from the prison policy because of the recommendations in the expired treatment plan. Doc. 102-3 at 29–31. Bayse told the mental health staff "you better not mess with my fucking hair" and, in response to Deputy Warden Harvey's statements that Bayse needed a haircut, "that bitch better not touch my hair." Doc. 94-2 at 17.

The warden team (Philbin, Harvey, Shelton) and mental health providers (Young, Davis) met with Bayse in mid-June 2020 and explained that the mental health treatment plan did not include exemptions to prison grooming and cosmetic policies. Doc. 94-2 at 16; Doc. 89 at 23. Bayse refused to accept the plan and began cursing and yelling, threatening that if the officials did not let him grow out his hair, he would self-harm. Doc. 94-2 at 16. Bayse claims that Deputy Warden Harvey said, "Bayse, you have a dick between your legs. You're a male and not a female," and Bayse admits to arguing with Harvey and demanding to be considered "a female." Doc. 102-3 at 33–34. In the end, the prison officials informed Bayse that they did not want him to harm himself, that they would do what was necessary to keep him safe,

and that he would still need to comply with the applicable grooming and cosmetic standards despite disagreeing with them. Doc. 94-2 at 16.

The prison officials went to great lengths to address Bayse's concerns while still enforcing prison policy. Bayse met with psychologist Dr. Rasheed less than two weeks after the June meeting. Doc. 89 at 68–69. But Bayse, again, refused to cooperate, doubled down on demanding special exceptions, and became angry with Dr. Rasheed, storming out when she tried to discuss "the inevitable event of [Bayse] getting a haircut." Doc. 89 at 69. For several months prison officials continued to provide mental health counseling, *see, e.g.*, Doc. 94-2 at 15 (August 2020), as well as hormones, *see, e.g.*, Doc. 102-14 at 3 (November 2020), but Bayse often refused to cooperate with the mental health providers, *see, e.g.*, Doc. 94-2 at 14 (October 2020); Doc. 94-2 at 12 (November 2020); Doc. 55-2 at 65–70 (December 2020).

Bayse also continued to refuse to voluntarily comply with the prison grooming policy, so a few months later on March 3, 2021, Deputy Warden Harvey instructed officers to transport Bayse to receive a haircut. Doc. 102-7 at 3. Officers Smith, Campbell, and Gaines all assisted with the process because Bayse continued to refuse to cooperate. Doc. 89 at 41–42. Because of his prior threats

of self-harm, prison officials took preventive measures right after the haircut.  A mental health counselor interviewed Bayse and officers escorted him to the crisis stabilization unit for observation for two days.  Doc. 89 at 42.  A few days after Bayse was released from observation, he claims to have "attempted auto-castration" but that another inmate "stopped" him.  Doc. 102-3 at 54; Doc. 1 at 9.

Bayse continued to clash with prison officials about the mental health treatment plan, Doc. 102-3 at 182, but despite Bayse's "self-damaging impulsivity, affective instability, and inappropriate intense anger" the officials continued to ensure that Bayse received treatment for both borderline personality disorder and gender dysphoria.  Doc. 94-3 at 7; *see also* Doc. 102-14 at 7; Doc. 94-2 at 10; Doc. 102-12 at 102–108, 114; Doc. 94-1 at 5–7; Doc. 95 at 6, 9.

## B.  Proceedings Below

In February 2022, Bayse sued prison wardens, officers, and mental health providers under § 1983, alleging that they violated the Eighth Amendment's ban on cruel and unusual punishments by refusing to grant special grooming and opposite-sex cosmetic exemptions.  At the screening stage, the district court dismissed several defendants because Bayse failed to state a claim against

14

them.  Doc. 20; Doc. 30.  Warden Philbin, Deputy Warden Shelton, Deputy Warden Harvey, officer Smith, and officer Gaines then moved to dismiss, arguing that any official-capacity claims against them should be dismissed and that Bayse failed to exhaust administrative remedies.  Doc. 55.  Young, Davis, and Clements (the mental health providers) also moved to dismiss, arguing that Bayse failed to exhaust administrative remedies and failed to state a deliberate-indifference claim.  Doc. 57.  The district court denied the motions to dismiss except as to the official-capacity claims.  Doc. 71; Doc. 74. Despite the fact that Bayse alleged that prison wardens were *following* the new treatment plan that was put in place when he moved to Augusta State Medical Prison, the court held that Bayse made out a deliberate-indifference claim by alleging that the prison wardens "refused to follow the [expired] treatment plan" when they told Bayse that he "would have to remove [his] makeup, earrings, nail polish, and cut [his] hair." Doc. 71 at 3, 16.

A few months later, Bayse, the prison wardens and guards, and the mental health providers each moved for summary judgment.  Doc. 87; Doc. 94; Doc. 102.  As part of their summary judgment motion, the wardens and guards asserted that they were entitled to qualified immunity and that Bayse's claim failed on the

merits for three reasons. *First*, refusing to permit Bayse to grow long hair or wear cosmetic items had no connection to any risk of medical harm. Doc. 102-2 at 9. *Second*, they could not have been subjectively reckless in denying Bayse's requests because, among other reasons, they relied on the mental health providers' medical judgment that Bayse's requests were for unnecessary items. Doc. 102-2 at 9. *Third*, the dispute was, at most, a difference in opinion between Bayse and the mental health providers on course of treatment, because Bayse received extensive treatment for gender dysphoria. Doc. 102-2 at 9–11. They also argued that Bayse produced no clearly established law to the contrary, and that, if anything, the relevant precedent, specifically *Keohane,* cut against Bayse, so they were entitled to qualified immunity. Doc. 102-2 at 14–15.

The district court denied summary judgment almost across the board, granting summary judgment to only officers Smith and Gaines. Doc. 130 (adopting magistrate judge's report and recommendation); *see* Doc. 123. The district court denied Bayse summary judgment for the simple reason that, although Bayse demanded grooming and opposite-sex cosmetic exemptions, he "failed to submit any evidence of medical necessity." Doc. 123 at

16

14. This failure "demonstrate[d]" Bayse's "inability to meet [his] burden of proof at trial." Doc. 123 at 12.

But rather than granting summary judgment to the prison wardens and mental health providers on the same basis, the district court flipped the burden of proof onto the defendants, holding that they were "not entitled to summary judgment because they have failed to establish an adequate and convincing record of undisputed facts." Doc. 123 at 15. The district court held that the defendants had not introduced enough evidence to prove that Bayse's requests "were *not* medically necessary" and thus could not secure summary judgment. Doc. 123 at 17 (emphasis added). The court did not even analyze whether the prison officials acted with subjective recklessness or whether their response was unreasonable—the other elements of deliberate indifference. For that matter, the district court did not explain what the "harm" was or how it was supposedly caused by defendants.

The district court then denied qualified immunity, concluding that a district court order and an unpublished Eleventh Circuit opinion clearly established that denying medically necessary treatment for gender dysphoria constitutes unconstitutional deliberate indifference. Doc. 123 at 21–22. And despite

17

recognizing that this Court's *published* precedent on the issue—*Keohane*—held that grooming and cosmetic exemptions were *not* medically necessary to treat gender dysphoria, the district court concluded that *Keohane* was irrelevant. Doc. 123 at 22. In its view, the prison wardens could not rely on *Keohane* because they "failed to present an adequate factual foundation" to disprove medical necessity. Doc. 123 at 22.[1]

### C. Standard of Review

This Court reviews *de novo* a denial of qualified immunity at summary judgment. *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024).

## SUMMARY OF ARGUMENT

To overcome qualified immunity, Bayse had to establish (1) a constitutional violation that was (2) based on clearly established law. Bayse cannot do either.

**I.** The district court erred when it denied the prison wardens summary judgment even while it held (correctly) that Bayse had failed to provide any evidence to prove the necessary elements of a deliberate-indifference claim. To make out that claim, Bayse had

---

[1] The mental health providers did not seek qualified immunity, *cf. Hinson v. Edmond*, 205 F.3d 1264 (11th Cir. 2000), and so only the prison wardens appealed the denial of qualified immunity.

to prove (1) that denying the grooming and cosmetic exemptions would cause Bayse an objectively "substantial risk of serious harm"; (2) that the wardens acted with criminal recklessness, that is, they *knew* that denying Bayse's requests would pose that risk; and (3) that the wardens' response to that risk was unreasonable. *Farmer*, 511 U.S. at 834, 837, 844.  Bayse fails at every turn.

**A.**  Bayse failed to produce any evidence that denying the requests for opposite-sex grooming and cosmetic exemptions would pose an objectively serious risk of substantial harm.  In fact, Bayse requested unnecessary cosmetics, not "life's necessities."  *Farmer*, 511 U.S. at 834.  Bayse must show that—accounting for the ongoing treatment—denying the requests for cosmetics created an objective, substantial risk of serious harm. Another way of putting it is that Bayse had to prove that cosmetics were "medically necessary."  *Keohane*, 952 F.3d at 1266. Yet not only did Bayse fail to prove as much, the district court correctly held that he "failed to submit *any evidence* of medical necessity."  Doc. 123 at 14 (emphasis added).

That should have been the end of it.  As this Court held in *Keohane*, and as the district court acknowledged, there is no deliberate indifference when the requested treatment is not "medically necessary."  Doc. 123 at 22 ("[T]he outcome in *Keohane*

was based on the plaintiff's failure to establish medical necessity.").  Indeed, as *Keohane* made clear, there is no deliberate indifference where there is even a *dispute* about whether a particular requested treatment is medically necessary.  952 F.3d at 1274.  Because Bayse "failed to submit any evidence of medical necessity," Doc. 123 at 14, his claim fails.

Even if Bayse had produced evidence, the claim still fails, because that would create only a "disagreement between healthcare professionals," which never amounts to deliberate indifference.  *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1273 (11th Cir. 2020).  Appropriate treatment for gender dysphoria is, at the very least, a disputed medical topic, and prison wardens were not deliberately indifferent simply because they refused to go outside of Bayse's treatment plan.

**B.**  Even if Bayse could identify some substantial risk of serious harm, Bayse produced no evidence of criminal recklessness on the part of the prison wardens.  That is, he could not prove that the prison wardens actually knew that denying Bayse's grooming and cosmetic requests posed a substantial risk of serious harm.  *Farmer*, 511 U.S. at 837.  The only available evidence cuts the other way—the prison wardens repeatedly made clear that they thought Bayse's requests had nothing to do with

medical care.  In fact, Bayse's mental health team made that explicit by refusing to include it in Bayse's treatment plan.

**C.**  Bayse also produced no evidence to show that the prison wardens' decision to follow the treatment plan and deny the grooming and cosmetic requests was unreasonable.  *Farmer*, 511 U.S. at 844.  Bayse did not establish that the security and medical concerns motivating that decision were unreasonable.  Again, the evidence cut against Bayse, because the mental health providers, exercising their medical judgment, concluded that the requests would not be appropriate treatment for Bayse, and the prison wardens repeatedly relied on prison policy.  Besides, prison officials provided Bayse with extensive care for gender dysphoria, including cross-sex hormones, endocrinology visits, and mental health therapy.  Bayse's claim boils down to a complaint that he preferred different treatment, which cannot support a deliberate-indifference claim.

**D.**  On top of everything else, Bayse did not identify any actual harm, let alone explain how the prison wardens' actions caused that harm.  Bayse threatened to commit self-harm if forced to get a haircut, but Bayse even admits that he ultimately did not do so—in Bayse's words, another inmate "stopped" him.  Doc. 1 at 9. And Bayse did not prove causation, which is especially

important here where Bayse has been diagnosed with borderline personality disorder, which causes thoughts of self-harm and suicide.

**II.**  Bayse loses on the merits, but at the very least, there is no clearly established law that prison wardens must provide grooming and cosmetic exemptions to gender-dysphoric inmates. And that is no surprise, because the on-point precedent, *Keohane*, holds the exact opposite.  At a bare minimum, the prison wardens are entitled to qualified immunity.

## ARGUMENT

Bayse cannot overcome qualified immunity without establishing both that the prison wardens violated the Eighth Amendment and that relevant precedent "clearly established" that their acts were unconstitutional.  *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).  The district court got both points wrong.

**I.  The district court erroneously held that the prison wardens could be liable for deliberate indifference even though Bayse established none of the necessary elements.**

Under the Eighth Amendment's prohibition on cruel and unusual punishment, prison officials cannot be deliberately indifferent to the serious medical needs of prisoners.  *Keohane*,

952 F.3d at 1265. But deliberate indifference requires far more than medical malpractice. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To prove a deliberate-indifference claim, a prisoner must establish that a prison official was criminally reckless. *See Farmer*, 511 U.S. at 839. So the prisoner must prove: (1) that he had a medical condition that—if left untreated—posed an objectively "substantial risk of serious harm" to the inmate; (2) that the specific prison official *knew* that his action or inaction would pose that serious risk of substantial harm to the inmate; (3) that the prison official's response was unreasonable given his knowledge of the situation. *Farmer*, 511 U.S. at 834, 837, 844.

This "deliberate indifference" standard "is a high standard," *West v. Tillman*, 496 F.3d 1321, 1333 (11th Cir. 2007). A prison official cannot be liable simply because he denied a prisoner medical care—only if "the official knows of and disregards an *excessive risk* to inmate health or safety" does the Eighth Amendment come into play; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. This high standard is necessary to ensure that officials are not held liable unless there is some degree

of "punitive intent." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

Bayse failed to establish any part of these requirements, and indeed, the district court *held as much* with respect to the very first requirement, an objectively serious risk of substantial harm. Only by erroneously shifting the burden of proof and failing to analyze most of these requirements did the district court deny summary judgment. This Court should correct those errors and reverse.

## A. Bayse produced no evidence of an objective, serious risk of substantial harm.

To make out a deliberate-indifference claim, an inmate must first prove, as an objective matter, that he faced a condition that, "if left unattended, pose[d] a substantial risk of serious harm." *Keohane*, 952 F.3d at 1266 (quotation omitted). That generally means the inmate must have "a life-threatening condition or an urgent medical condition that would be exacerbated by delay" in treatment. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1330 (11th Cir. 2007). The question is "whether the decision not to [grant a plaintiff's requests]—in light of the continued provision of all ameliorative measures currently afforded [him]" would create an objectively serious risk of substantial harm. *Kosilek v. Spencer*,

774 F.3d 63, 89 (1st Cir. 2014) (en banc).  When the "'seriousness' of an inmate's medical needs" are in dispute, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of" the prison officials' decision to provide different treatment.  *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994) (quotation omitted).  Another way of putting this initial requirement is that the prisoner must prove that some treatment or action is objectively "medically necessary." *Keohane*, 952 F.3d at 1266.

Critically, where there is a *dispute* as to whether a particular action is medically necessary, it isn't.  *Hoffer*, 973 F.3d at 1273.  If reasonable minds could disagree, there is no cruel and unusual punishment.  The Eighth Amendment is not a backdoor for prisoners to micromanage prison medical care and demand preferred treatment.  *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).  The Eighth Amendment requires only minimally competent medical care, so it must be virtually undisputed that a particular type of care is required.  *Keohane*, 952 F.3d at 1278 n.15.

**1.**  As the district court held, Bayse "failed to submit *any* evidence of medical necessity" to support the claim that long hair, makeup, nail polish, and earrings are a necessary treatment for

gender dysphoria.  Doc. 123 at 14 (emphasis added).  In other words, Bayse produced no evidence that he would face a substantial risk of serious harm in the absence of obtaining feminine cosmetic items.  The district court recognized as much but then ignored its own holding.  That is sufficient for reversal on its own.

The district court came to the opposite conclusion by shifting the burden of proof onto the prison wardens to *disprove* medical necessity.  Doc. 123 at 17 ("Reasonable jurors could find defendants failed to establish social transitioning accommodations were *not* medically necessary." (emphasis added)).  But that is plainly wrong.  *Hoffer*, 973 F.3d at 1274.  The burden of proof is always on the plaintiff to *prove* each required element of a deliberate-indifference claim.  *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

And with the burden of proof correctly placed, this is a simple case.  The district court was correct that Bayse produced no competent evidence of medical necessity.  Bayse relied on an *outdated* treatment plan and a standard-of-care document produced by the advocacy group World Professional Association for Transgender Care (WPATH).  Doc. 123 at 14; *see Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (WPATH "reflect[s] not

consensus, but merely one side in a sharply contested medical debate"). But as the district court correctly held, neither Bayse's expired treatment plan nor the WPATH recommendations could or did establish that denying grooming and opposite-sex cosmetic exemptions would cause Bayse serious harm—i.e., that those items were medically necessary. Doc. 123 at 14. An expired treatment plan could not even in principle establish that something is medically necessary when superseded by a newer plan, and the equivocal suggestion of a controversial advocacy group is proof of nothing. *See* Doc. 119 at 8 (WPATH guidelines are "flexible" recommendations).

The only relevant evidence cuts *against* Bayse. Both Dr. Clements, Bayse's treating psychologist, and Minnie Davis, Bayse's licensed professional counselor, concluded that in their "professional opinion[s]" "female grooming and cosmetic accommodations would not be appropriate or clinically indicated for Inmate Bayse." Doc. 94-1 at 4; Doc. 94-3 at 3. Bayse's mental health team developed a comprehensive treatment plan when Bayse was transferred to Augusta State Medical Prison, and they made clear to Bayse from the start that grooming and cosmetic exemptions were not required for treatment. Doc. 95 at 5. The district court apparently thought this evidence was insufficient to

prove that cosmetic items are not medically necessary, Doc. 123 at 14, but even if that were true (and it is not), it hardly matters. The burden of proof is on Bayse, not the prison wardens.

**2.** Bayse might argue there was some potential disagreement among medical professionals in this case, but that doesn't cut it. When the proper course of treatment for a particular diagnosis "is the subject of genuine, good-faith disagreement," then a prison official's decision to pick one course of treatment over another is never deliberate indifference. *Hoffer*, 973 F.3d at 1273; *Kosilek*, 774 F.3d at 82. "There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220.

The treatments Bayse has demanded are at least controversial, if not outright inappropriate. In fact, this Court specifically held in *Keohane* that these ongoing disputes bar deliberate-indifference claims based on the denial of grooming and opposite-sex cosmetics exemptions. 952 F.3d at 1274. Many states have banned "gender transition" interventions for minors altogether, recognizing "that hormonal and surgical interventions often do not resolve the underlying psychological issues affecting the individual" and increase a person's risks of actual health

28

problems such as "cardiovascular disease, thromboembolic stroke, asthma, COPD, and cancer." *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1212 (11th Cir. 2023) (quotation omitted). The debate is so contentious that some hospitals even shifted to providing minors cross-sex hormones only in secret after publicly declaring that they would not provide them.[2] Proponents of cross-sex hormones often point to documentation produced by WPATH as providing guidance for gender dysphoria care, *see Eknes-Tucker*, 80 F.4th at 1217, but the WPATH organization is "riddled with far more doubt than [its] outward messag[ing]" suggests, fraught with concerns, for example, about "the impossibility of gaining . . . informed consent" from children and patients with mental health disorders.[3] The "WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate" about proper treatment for gender dysphoria. *Gibson*, 920 F.3d at 221; *Kosilek*, 774 F.3d at 77–78

---

[2] Emily Yoffe, *A Doctor Told the Truth. The Feds Showed Up at His Door.*, The Free Press (June 10, 2024) https://www.thefp.com/p/eithan-haim-gender-distressed-children-indicted.

[3] *Leaked discussions reveal uncertainty about transgender care*, The Economist (March 5, 2024) https://www.economist.com/united-states/2024/03/05/leaked-discussions-reveal-uncertainty-about-transgender-care.

(explaining that WPATH is "an advocacy group" where "[s]kepticism and strong alternate views are not well tolerated.").

Bayse's dispute with his mental health providers is thus (at most) a microcosm of the broader societal debate about gender and sex. The medical providers at Augusta State Medical Prison concluded that, in their "professional opinion[s]," "female grooming and cosmetic accommodations would not be appropriate or clinically indicated for Inmate Bayse." Doc. 94-1 at 4; Doc. 94-3 at 3. Bayse might disagree about the providers' approach to gender dysphoria, but "the adequacy of that care is the subject of genuine, good-faith disagreement between healthcare professionals," so the mental health providers' decision not to defer to the prisoner's side of the debate was not deliberate indifference. *Hoffer*, 973 F.3d at 1273; *see also Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995).

Grooming exemptions and cosmetic items may (or may not) be "psychologically pleasing" privileges, *Keohane*, 952 F.3d at 1264, but the Eighth Amendment does not mandate "comfortable prisons," *Farmer*, 511 U.S. at 832 (quotation omitted). The Eighth Amendment permits "categorical judgments about the necessity and efficacy of certain medical treatments," and requests like Bayse's cannot support a deliberate-indifference claim. *Gibson*,

920 F.3d at 225.  Long hair, makeup, and nail polish simply are not among "life's necessities." *Farmer*, 511 U.S. at 834.

The most that can be said is that Bayse's anger and frustration with the denial of the requests for grooming and cosmetic exemptions are part of the "'routine discomfort' that may result merely from incarceration." *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).  Prison is a stressful environment, so prisoners may suffer from "stress-related ailments" such as "nausea, shakes, headache and depressed appetite," but that does not amount to a substantial risk of serious harm, *id.*, and it certainly does not establish that cosmetic items are medically necessary.[4]

---

[4] In his briefing below, Bayse asserted that cosmetics must be medically necessary because he would commit self-harm if he did not obtain them.  *E.g.*, Doc. 87 at 7.  The district court did not accept that theory and for good reason.  Bayse's mere assertion cannot prove medical necessity, nor can he prove medical necessity by threatening self-harm.  "[S]uicide threats by prisoners as a means of receiving desired benefits . . . require firm rejection by the authorities, who must be given ample discretion in dealing with such situations." *Kosilek*, 774 F.3d at 94.  Prisoners cannot leverage the Eighth Amendment's protections against cruel and unusual punishment into a bully tactic of "using threats of suicide . . . to force the prison authorities to comply with [their] particular demands." *Id.*

31

The district court correctly held that Bayes produced no evidence of medical necessity, but it then declined to rule for the prison wardens.  This Court should reverse.

## B.  Bayse produced no evidence of subjective criminal recklessness.

The Court need not move past Bayse's plain failure to prove that cosmetic items and long hair are medically necessary.  But Bayse's claim also fails for other reasons, including that he failed to establish criminal recklessness.

To make out a claim of deliberate indifference, the plaintiff must prove criminal recklessness: that is, the prison official must know that the prisoner would be exposed to a substantial risk of serious harm unless the prison official provides the requested treatment.  To emphasize: the official must *know* that they need to act—which happens only when they draw the "actual inference of required action"—but then consciously refuse to act.  *Taylor*, 221 F.3d at 1258.

Bayse produced no evidence that any of the prison wardens personally inferred that refusing grooming and cosmetic exceptions would likely cause substantial harm.  To the contrary, the evidence shows that the wardens' steadfast position from the beginning was that Bayse's requests had nothing to do with

32

medical care. Doc. 55-2 at 202. The wardens consistently concluded—and informed Bayse—that his requests were both medically unnecessary and violated prison policy. Doc. 55-2 at 203; Doc. 94 at 16.

To be sure, *Bayse* repeatedly told them that makeup and long hair were medically necessary treatments, but the prison wardens could—and did—disagree. For example, in a June 8, 2020, grievance, Bayse argued that Deputy Warden Harvey wrongly ordered a haircut because "makeup, earrings, nail polish, and hair length are medically necessary." Doc. 55-2 at 197. But Deputy Warden Harvey responded that she was merely enforcing prison policy, and a member of Bayse's medical treatment team responded that Bayse's request was not "necessary for the mental health treatment of this offender." Doc. 55-2 at 202–03.

The prison wardens repeatedly relied on the fact that Bayse's requests were not supported by the treatment plan for gender dysphoria. Doc. 55-2 at 165, 198–203; Doc. 94-1 at 4; Doc. 94-3 at 3. Because the mental health team had decided that Bayse's requests for cosmetic items and longer hair were not recommended medical care, the prison wardens had no reason to treat them as anything but questions of prison policy and prison security. Prison wardens who execute a treatment plan "that,

33

although disfavored by some in the field, is presented by competent professionals[,] d[o] not exhibit a level of inattention or callousness to a prisoner's needs rising to a constitutional violation." *Kosilek*, 774 F.3d at 91–92.

Not only did Bayse fail to produce any evidence of criminal recklessness, the district court failed even to consider this issue. In its view, "the subjective component" of deliberate indifference turned solely on the question of whether the prisoner's request was "medically necessary." Doc. 123 at 13–14. Of course, that makes no sense—the objective and subjective requirements cannot be collapsed into one. The district court never considered whether, much less concluded, that there was sufficient evidence that each prison warden personally concluded that Bayse would face a substantial risk of serious harm in the absence of feminine cosmetic items. If it had, the answer would have been a clear "no" as to all three.

### C. Bayse produced no evidence that the prison wardens' denial of his request was unreasonable.

To satisfy the third element of a deliberate-indifference claim, the prisoner must prove that the officials' response was objectively unreasonable. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may [still] be found free

34

from liability," as long as "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. And when medical treatment is involved, any course of treatment "within the boundaries of modern medicine" qualifies as reasonable treatment—"even if it is subpar." *Keohane*, 952 F.3d at 1266, 1277.

The prison wardens' decision to refuse Bayse's requests was plainly reasonable. The Eighth Amendment protects against deliberate indifference in the context of medical care and risk of physical harm; it does not give inmates a right to demand "nonmedical cosmetic accommodations." *Campbell*, 936 F.3d at 549. If the constitution "doesn't require prison authorities to schedule [a kidney] transplant" for an inmate with kidney failure or provide inmates with antiviral drugs for chronic HCV, *Hoffer*, 973 F.3d at 1266, 1272, then it does not require prison officials to give an inmate with gender dysphoria permission to grow long hair and wear makeup simply because the inmate wants to do so. And if makeup and long hair are not medically necessary for women to be women—and they are not—then they are not medically necessary for men that identify as women either.

Of course, the prison wardens were not required to introduce *any* evidence on this issue. And the general principle has already

35

been established that it is reasonable for prison officials to deny gender dysphoric prisoners grooming and cosmetic exemptions. *Keohane*, 952 F.3d at 1274–75. "There is no reason why—as a matter of either common sense or constitutional law—one state cannot rely on the universally shared experiences and policy determinations of other states" on these issues; it is nonsensical to relitigate this issue in every state, with every prisoner, *Gibson*, 920 F.3d at 224—and, for serial litigators like Bayse*,* with the same prisoner multiple times over. *Keohane* held that refusing these exemptions is not unreasonable, and that is enough to decide this case.

On top of that, Bayse has no ground to stand on because the prison medical providers provided extensive care for gender dysphoria. Bayse's argument boils down to a claim that he would have "preferred" different treatment. *Keohane*, 952 F.3d at 1277. "While the medical community may disagree among themselves as to the best form of treatment for [Bayse's] condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs." *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986). All the Eighth Amendment requires is "minimally adequate medical care," and not even Bayse has

argued that the prison medical providers refused to provide *any* treatment for gender dysphoria. *Keohane*, 952 F.3d at 1265 (quotation omitted). Bayse was consistently provided cross-sex hormones, regular endocrinology visits to monitor the effects and side-effects of the hormones, and regular mental health therapy. Doc. 95 at 10. These treatments far exceed the minimally adequate care. As this Court explained in *Hoffer*, it is not unreasonable for prison officials to reject a prisoner's preferred course of treatment in favor of some lesser course of treatment— even if that means merely "diagnosing, monitoring, and managing" the condition rather than providing "a complete cure." 973 F.3d at 1273.

It is especially reasonable for wardens to refuse to cater to a prisoners' demands for additional treatment when they are fully aware that the prison's medical providers are *already* providing extensive care. It is never unreasonable for prison officials to rely on the prison medical providers' decision to decline a particular form of treatment. *See Kosilek*, 774 F.3d at 91–92.

The prison wardens—to the extent they were even involved— likewise responded to Bayse's repeated threats of self-harm. Before the haircut, Bayse's mental health providers repeatedly attempted to discuss the situation and to encourage Bayse to

37

develop coping mechanisms to reduce the likelihood of self-harm after the haircut. *E.g.*, Doc. 89 at 68–69. And after the haircut the officials also took extra precautions to prevent Bayse from engaging in self-harm. Bayse was "interviewed by a mental health counselor" and escorted to the crisis stabilization unit for observation for two days. Doc. 89 at 42. On this point the district court was correct: the prison officials' response to Bayse's threats of self-harm was "the antithes[i]s of deliberate indifference." Doc. 123 at 25.

On top of that, the prison medical providers provided an extensive regime of mental health therapy and antipsychotic medication to treat Bayse's borderline personality disorder. Doc. 94-1 at 5; Doc. 95 at 6–7; Doc. 102-3 at 15–16, 52–53. Bayse had repeatedly threatened suicide and self-harm, attempted suicide, and engaged in acts of self-harm since he was first incarcerated in 1998. Doc. 102-3 at 52–53. As a result, the prison medical providers treated Bayse with "regular one-on-one mental health counseling" and even allowed Bayse to work with "more specialized counselors." Doc. 94-1 at 5–7.

If anything, *granting* Bayse's requests would produce the real risk of serious harm. Permitting an inmate in an all-male prison to present himself "as a female" would *introduce* a serious risk of

harm—making the inmate "a target for abuse." *Keohane*, 952 F.3d at 1275. These sorts of "security considerations inherent in the functioning of a penological institution must be given significant weight" in the Eighth Amendment context. *Id.*

Even when an inmate identifies a treatment that would mitigate a serious risk of harm—which, again, Bayse has not done—the deliberate-indifference calculus shifts dramatically when the decision whether to provide medical care "clash[es] with . . . competing institutional concerns for the safety of prison staff or other inmates." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Prison officials' actions must "be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Keohane*, 952 F.3d at 1275–76 (quotation omitted).

"No legal authority compels the state, every time a prison inmate demands [grooming and cosmetic exemptions], to undertake the time and expense of assembling a record of medical experts, pointing out what we already know—that [treatment for gender dysphoria] remains one of the most hotly debated topics within the medical community today." *Gibson*, 920 F.3d at 224.

The prison wardens' actions were reasonable, and the district court erred in implicitly holding otherwise.

### D.  Bayse produced no evidence that the prison wardens caused him *any* harm.

Deliberate indifference also requires causation: a plaintiff must establish that the defendants' deliberate indifference was "the proximate cause of the plaintiff['s] injuries." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582, 1584 (11th Cir. 1995) (quotation omitted).  And the causation analysis itself involves two components: the prisoner must prove both (1) a link between the prison officials' allegedly deliberately indifferent act or omission and the excessive risk of harm *and* (2) a link between the excessive risk of harm and an actual injury.

**1.**  Bayse's claim fail at both steps.  *First*, Bayse did not suffer any harm when the prison wardens denied the requests to grow long hair and wear opposite-sex cosmetic items.  To be sure, Bayse *threatened* self-harm if the prison wardens refused to comply with his demands.  Doc. 94-2 at 16.  But even Bayse admits that he refrained from doing so.  After the haircut, prison officials carefully monitored Bayse to prevent any self-harm.  And Bayse admitted that he never followed through with the self-harm after being released from observation.  Doc. 102-3 at 54; Doc. 1 at 9.

40

Bayse's only other claims of harm are that after the haircut he had "thoughts of suicide" along with thoughts of self-harm. Doc. 102-3 at 51. But, at most, all that shows is a *risk* of harm, not actual harm, and the prison officials' reasonable response is likely what prevented the actual harm—suicide or serious self-harm—from occurring.

**2.** Even if Bayse could show some harm during this period, he came nowhere near establishing a causal connection between the prison wardens' actions and that harm. To prove causation, the prisoner "must place verifying medical evidence in the record to establish the detrimental effect of" the official's denial of treatment. *Hill*, 40 F.3d at 1188. "[M]edical causation issue[s] [often] present[] a technical and scientific issue that requires the specialized knowledge of an expert medical witness." *Wingster v. Head*, 318 F. App'x 809, 815 (11th Cir. 2009); *see Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021); *Ellis v. United States*, 673 F.3d 367, 373 (5th Cir. 2012).

Bayse has presented no evidence connecting thoughts of suicide and self-harm to the prison wardens' refusal to allow cosmetic items and longer hair. Bayse's own evidence suggests the exact opposite. Bayse has been suffering from anxiety, depression, and thoughts of suicide and self-harm "throughout

41

[his] life," "[a]s far back as [he] can remember." Doc. 102-3 at 52. From the start of incarceration in 1998, Bayse repeatedly threatened suicide and self-harm, attempted suicide, and engaged in acts of self-harm; prison officials diagnosed Bayse with borderline personality disorder, schizoaffective disorder, and major depressive disorder, and prescribed an antipsychotic medication (Risperdal). Doc. 102-3 at 14–15, 52–53; *see also Bayse v. Dozier*, No. 5:18-cv-49, Doc. 48-3 at 20, 70–71, 76–77. Borderline personality disorder often causes thoughts and acts of self-harm, and here both the borderline personality disorder and the self-harm long predate Bayse's diagnosis of gender dysphoria. Doc. 102-3 at 15, 17–18, 52–53; *see also Bayse v. Dozier*, No. 5:18-cv-49, Doc. 48-3 at 20, 70–71, 76–77.

That evidence suggests that Bayse's thoughts of self-harm stem from other mental health disorders, long predate gender dysphoria, and have nothing to do with the demands for grooming and cosmetic exemptions. Bayse would need significant "verifying medical evidence" to establish the contrary, *Hill*, 40 F.3d at 1188; it cannot rest on the mere fact that Bayse *asserts* as much.

## II. At minimum, the prison wardens are entitled to qualified immunity because there is no clearly established law that would provide for liability.

Supposing for a moment that any of the above is unclear (though it is clear), the district court should have held that the prison wardens are nevertheless entitled to qualified immunity. The district court identified no clearly established law to the contrary and ignored *Keohane*, which held that refusing to permit a male inmate with gender dysphoria to grow long "hair, use makeup, and wear female undergarments" does not create "a substantial risk of self-harm or severe psychological pain." 952 F.3d at 1272, 1274. The prison wardens thus are triply entitled to qualified immunity: (1) Bayse's claim fails on the merits; (2) even if not, Bayse has no clearly established law supporting his claim; and (3) in fact, *Keohane* unmistakably precludes that exact claim.

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation omitted). When officers were acting within their "discretionary authority," a plaintiff must prove "(1) that the officers violated the constitutional rights at issue, and (2) that

43

those rights were clearly established at the time of the alleged misconduct." *King v. Pridmore*, 961 F.3d 1135, 1142 (11th Cir. 2020).

"The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or this Court found a violation based on materially similar facts." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (quotation omitted). Cases in which the law is clearly established without a materially similar case are "rare and don't arise often," and occur only when "the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that" the violation is obvious to any reasonable person. *King*, 961 F.3d at 1146.

The district court's brushing aside of qualified immunity is indefensible. Again, Bayse's claim fails on the merits. *See supra* Part I. But more than that, neither Bayse nor the district court could point to *any* cases clearly establishing the law at issue here. No case establishes that granting an inmate with gender dysphoria permission to grow long hair or wear opposite-sex cosmetic items is medically necessary. And the same is true for the reasonableness of the officers' response. No case clearly

44

establishes that providing an inmate with regular therapy, cross-sex hormones, and endocrinology visits is *unreasonably* deficient medical care.

The district court's theory of clearly established law was based on an unpublished decision and a district court order, *see* Doc. 123 at 21–22 (citing *Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014), and *Diamond v. Owens*, 131 F. Supp. 3d 1346 (M.D. Ga. 2015)), which cannot clearly establish law, *Gilmore v. Hodges*, 738 F.3d 266, 279 (11th Cir. 2013). On top of that, in *Kothmann* almost *every* single relevant fact was different from the situation here: the prison warden refused to permit a gender dysphoric prisoner to *even see* an endocrinologist about cross-sex hormones, despite the fact that the prisoner had undergone a hysterectomy, oophorectomy, and double mastectomy and had been taking cross-sex hormones for years. 558 F. App'x at 908. Bayse, by contrast, had regular endocrinology visits, was provided cross-sex hormones, and had not undergone any genital surgery. Doc. 95 at 10.

To be sure, as the district court noted, a materially similar case is not *always* necessary. Doc. 130 at 1. But "obvious clarity" cases "are rare and don't arise often." *King*, 961 F.3d at 1146. This case is not that rare case.

In fact, if anything is "obviously" clear, it is that the only on-point case law is against Bayse, not for him. *Keohane*'s holding is unmistakable. Refusing to permit a male inmate with gender dysphoria to wear long "hair, use makeup, and wear female undergarments" does not create "a substantial risk of self-harm or severe psychological pain." *Keohane*, 952 F.3d at 1272, 1274. The district court acknowledged that Bayse "failed to submit any evidence of medical necessity" and that "the outcome in *Keohane* was based on the plaintiff's failure to establish medical necessity." Doc. 123 at 14, 22. The district court's conclusion that the cases Bayse produced—none—had similar enough facts to overcome qualified immunity is irreconcilable with *Keohane*. Doc. 130 at 1. The district court was plainly wrong—even under its own analysis—to deny qualified immunity.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the court below.

Respectfully submitted.


|  | /s/ *Stephen J. Petrany* |
|  | Christopher M. Carr |
| Loretta L. Pinkston-Pope | *Attorney General of Georgia* |
| *Deputy Attorney General* | |
| Roger A. Chalmers | Stephen J. Petrany |
| *Sr. Asst. Attorney General* | *Solicitor General* |

Jason H. Kang
   *Assistant Attorney General*

James E. Barrett
   *Deputy Solicitor General*

Office of the Georgia
   Attorney General
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellants*

47

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 9339 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany